### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> **v.** <br><br> **WILLIAM BROCK,** <br><br><div align="right">**Defendant.**</div> | **Case No.: 23-cr-26 (RCL)** |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

Defendant Brock moves to suppress GPS data collected from a device installed on him by the D.C. Court Services and Offender Supervision Agency (CSOSA), claiming that this device was unlawfully installed by CSOSA. It is true that a D.C. Superior Court judge found that a device installed on Brock in July 2020 was installed without proper authorization. Unfortunately for Brock, that device—which was removed from his ankle in February 2021—has nothing to do with this case. Following Brock's failure to comply with his supervision, including a re-arrest involving drugs and guns, a new GPS device was lawfully installed on his ankle in March 2021. It is GPS data from that device—which reflects Brock's involvement in an October 6, 2021, armored truck robbery—that the Government intends on introducing at trial. Brock's motion is based entirely on a factual error and should be denied.

## BACKGROUND

This case involves three robberies of Brinks armored trucks in October and December 2021, and March 2022. All three robberies occurred at the same time (around 9:00 AM), on the same day (Wednesday), and targeted a Brinks armored truck. In all three, the robbers arrived prior to the Brinks truck and laid in wait, suggesting they had surveilled the driver's route on previous occasions. In the first and second robberies, the same Brinks driver was targeted and

<div align="center">1</div>

assaulted.  The first and third robberies occurred at the same location.  Additionally, in the first and third robberies, the robbers used stolen vehicles as getaway cars before abandoning and burning those vehicles.  The Government anticipates proving at trial that Brock played a central role in all three robberies.

### *Brock's 2016 and 2017 Convictions and Installation of a GPS Device*

On May 26, 2017, Brock pled guilty to resolve three different pending criminal matters in D.C. Superior Court.  In 2017 CF3 003100, Brock pled guilty to stabbing a man multiple times in D.C. jail.  In 2016 CF2 007379, he pled guilty to the unlawful possession of a firearm by an individual who had committed a prior crime of violence.  And in 2016 CF2 006128, Brock pled guilty to the attempted unlawful possession of PCP with the intent to distribute.

On November 30, 2017, Brock was sentenced in all three matters.  In 2017 CF3 003100, for the jail stabbing, Brock was sentenced to thirty-two months' incarceration, suspended as to all but fourteen months, followed by one year of supervised probation.  In 2016 CF2 007379, for the unlawful possession of a firearm, Brock was sentenced to forty months' incarceration suspended as to all but thirty-six months, followed by one year of supervised probation.  In 2016 CF2 006128, for the PCP charge, Brock was sentenced to 14 months' incarceration suspended as to all but six months, followed by one year of supervised probation.  The terms of imprisonment were to run consecutively, though the terms of probation were to run concurrently.

For each of Brock's cases, the Court clerk filed a three-page Judgment and Commitment Order ("J&C").  Copies of each are attached as Exhibits A, B, and C to this opposition.  The first page of each J&C states:  "Defendant is hereby ordered placed on probation – See – Page 2 of this Order for Conditions of Probation."  Exhibits A-C, at 1.  Page 2 of each J&C states:  "The Defendant is hereby placed on **\*Supervised Probation** for a term of **1 year(s).**"  Each page then

outlines the general conditions of supervised probation, which includes, *inter alia*, "obey all laws, ordinances, and regulations," reporting to community supervision, and "[p]articipate in and complete other CSOSA's programs as identified through CSOSA's risk and needs assessments." At the bottom of the second page of each J&C there is a header titled "**Other Special Conditions**."  Immediately following this header is a page titled "**INTERVENTION PLAN,**" which lists several specific special conditions imposed by CSOSA, including obtaining a GED, seeking and maintaining employment, participating in mental health and substance abuse treatment, and, as highlighted below, complying with GPS monitoring.

*Figure 1*

Each of the J&Cs contains this identical provision as part of CSOSA's intervention plan for Mr. Brock, listed under "**Other Special Conditions.**"

On July 23, 2020, Mr. Brock was released from prison and reported to CSOSA for supervision.  Prior to meeting with Mr. Brock, pursuant to normal practice, his Community Supervision Officer (CSO) Jane Chappell received copies of the Judgement and Committal Orders (J&Cs) from CSOSA's Offender Processing unit.  Each of the filed J&Cs included a third page which specified under "**Other Special Conditions**," that Mr. Brock was to be placed on GPS monitoring.  CSO Chappell reviewed the conditions for all three cases on which Mr. Brock was on supervision, including the GPS monitoring condition, and consistent with those conditions, referred Mr. Brock for the installation of a GPS monitoring device.

On July 24, 2020, Brock reported for device installation and a device (Device No. 12-790807) was installed on his left ankle.

### *The Imposition of Additional GPS Monitoring as a Sanction for Non-Compliance*

Mr. Brock was—at first—marginally compliant with supervision.  As a result, his GPS device (No. 12-790807) was removed from his ankle on February 8, 2021.  Brock's compliance with supervision proceeded to nosedive.

On February 10, 2021, Brock was arrested and charged with Possession with Intent to Distribute PCP.  MPD executed a search warrant in an apartment and found Brock along with five other men.  Inside the apartment were multiple bags of what appeared to be crack cocaine, a bag of suspected oxycodone pills, vials and a jar of liquid consistent in appearance and smell to PCP, heroin, and three handguns.  Brock was arrested but released pending further investigation.  Brock did not report this arrest to CSOSA.  As a result of this arrest, CSOSA ordered Brock to be placed on GPS monitoring with a curfew as a sanction.  Brock was instructed to appear for

GPS installation on February 12, 2021.  He failed to do so.  He also failed to report to CSOSA and failed to report to drug testing.

Brock ultimately reported to be placed on a new GPS device on March 8, 2021.  Device No. 12-750717 was installed on his left ankle.  When CSOSA installs a GPS device on an offender, they require the offender to sign both a referral form and a contract.  CSOSA records reflect that a CSOSA representative explained both forms to Brock.  Brock signed the referral form indicating that he acknowledged the GPS device was being installed as a sanction.

*Figure 2[1]*



Brock also signed CSOSA's GPS Contract.  The contract requires an offender to keep their device charged, explains how to charge the device, and how to avoid damaging the device. Additionally, the contract contains the following provisions:

*Figures 3, 4, and 5*



7.  All GPS activities will be monitored by CSOSA's Monitoring Center twenty-four (24) hours per day. You shall respond immediately to all calls or messages received regarding alert violations and follow the instructions given by the Monitoring Center staff and/or any other authorized representative of CSOSA.

9.  All movement will be tracked and stored as an official record.

14. All GPS data including tracking and suspected violation data are accessible to various local (i.e. Metropolitan Police Department) and national (i.e. U.S. Capitol Police) law enforcement agencies. In addition to CSOSA, your device may be monitored by these law enforcement agencies.

15. The initial monitoring period is 30, 60, or 90 days based on the attached GPS Referral. The initial monitoring period may be subject to extension up to 90 days if you are non-compliant with supervision or this Contract.

---

[1] The entirety of the March 8, 2021 Referral Form and Contract are attached as Exhibit D.

Mr. Brock signed the form indicating that he understood these provisions.

*Figure 6*

| The CSOSA GPS Contract has been provided to me. I understand the tampering law, my responsibilities, and possible consequences of my failure to comply with these guidelines. My signature confirms my understanding of the above and confirms receipt of the GPS equipment. | | |
| --- | --- | --- |
| **Offender's Name (Print)** | **Offender's Signature** | **Today's Date** |
| X  William Brock | X  William Brock | X  3-8-21 |

Despite the installation of a new device, Brock's failure to comply with his release conditions only continued. He repeatedly failed to appear for drug treatment and for check-ins with CSOSA, tested positive for PCP, cocaine, and ETF, and failed to comply with his curfew.

As a result of his continued failure to comply with his conditions of release, on June 24, 2021, Brock was ordered to continue on GPS monitoring as an additional sanction. Brock and his attorney reported to CSOSA on June 24, 2021 and signed an updated GPS referral and contract for an additional ninety days of GPS monitoring. Once again, Brock signed each form, indicating, among other things, that he understood that his GPS data was accessible to both local and national law enforcement.

*Figure 7*[2]

---

[2] The entirety of the June 24, 2021 Referral Form and Contract are attached as Exhibit E.

14. All GPS data including tracking and suspected violation data are accessible to various local (i.e. Metropolitan Police Department) and national (i.e. U.S. Capitol Police) law enforcement agencies. In addition to CSOSA, your device may be monitored by these law enforcement agencies.

15. The initial monitoring period is 30, 60, or 90 days based on the attached GPS Referral. The initial monitoring period may be subject to extension up to 90 days if you are non-compliant with supervision or this Contract.

**The CSOSA GPS Contract has been provided to me. I understand the tampering law, my responsibilities, and possible consequences of my failure to comply with these guidelines. My signature confirms my understanding of the above and confirms receipt of the GPS equipment.**

| Offender's Name (Print) | Offender's Signature | Today's Date |
|---|---|---|
| X  _William Brock_ | X  _William Brock_ | X  _6-24-21_ |
| **EMT's Name (Print)** | **EMT's Signature** | **Today's Date** |
| _Wesley Holmes_ | _[signature]_ | _6.24.21_ |

Revised 2020-03-20

Brock's GPS Device (No. 12-750717) remained the same and remained installed on his left ankle from June 24, 2021 to September 24, 2021. Despite the new GPS sanction, Brock's non-compliance continued. He failed to comply with his curfew multiple times, failed to charge his GPS device, failed to report to CSOSA, tested positive for drugs and alcohol, and missed drug tests.

On September 29, 2021, Brock was ordered to continue with GPS monitoring as an additional sanction given his non-compliance. Brock reported to CSOSA and signed a new GPS referral and contract. Brock's Device (No. 12-750717) remained the same. Brock signed the referral form, acknowledging that he was being sanctioned for up to ninety days.

*Figure 8[3]*

| Monitoring Information | (To be completed by Referring Official) | | | | |
|---|---|---|---|---|---|
| Reason for GPS Monitoring: | | ☐ Condition of Release | | | ☑ Sanction |
| Initial Monitoring Duration*: | ☐ 30 Days | ☐ 60 Days | | ☐ 90 Days | Up to 90 Days |
| Offender Sign Here  Acknowledging GPS installation based on the stated requirement*: | _William Brock_ | | | | |

Brock once again signed the GPS contract, indicating, among other things, that he understood

---

3 The entirety of the September 29, 2021 Referral Form and Contract are attached as Exhibit F.

that his GPS data was accessible to both local and national law enforcement.

*Figure 9*



14. All GPS data including tracking and suspected violation data are accessible to various local (i.e. Metropolitan Police Department) and national (i.e. U.S. Capitol Police) law enforcement agencies. In addition to CSOSA, your device may be monitored by these law enforcement agencies.

15. The initial monitoring period is 30, 60, or 90 days based on the attached GPS Referral. The initial monitoring period may be subject to extension up to 90 days if you are non-compliant with supervision or this Contract.

**The CSOSA GPS Contract has been provided to me. I understand the tampering law, my responsibilities, and possible consequences of my failure to comply with these guidelines. My signature confirms my understanding of the above and confirms receipt of the GPS equipment.**

| Offender's Name (Print) | Offender's Signature | Today's Date |
|---|---|---|
| X  *William Brock* | X  *William Brock* | X  *9/29/21* |
| **EMT's Name (Print)** | **EMT's Signature** | **Today's Date** |
|  |  | *9/29/21* |

Revised 2020-03-20

One week later, on October 6, 2021, Mr. Brock was wearing GPS Device No. 12-750717 on his left ankle.

### The October 6, 2021 Robbery[4]

On October 6, 2021, at approximately 9:30 a.m., a Brinks armored truck driver was robbed by four men while the truck was parked in front of SunTrust Bank at 1340 Good Hope Road Southeast, Washington, D.C.  Three of the robbers arrived in a dark blue Infiniti SUV. The subjects, who were armed with long guns, approached the driver of the armored truck as he attempted to deliver the money to the bank.  They beat the driver and stole from him a courier bag containing $103,800. The fourth subject stayed in the SUV, which fled the scene following the robbery.

Shortly after, at approximately 9:36 a.m., D.C. Fire & EMS found the vehicle used in the

---

[4] Brock's GPS data was only relied on with respect to the October 6, 2021 robbery as he was removed from GPS monitoring shortly afterwards.  Therefore, the Government does not include facts underlying the two other robberies which Brock orchestrated or was involved in.

robbery—a dark blue Infiniti SUV—approximately half a mile from the robbery location. The center of the dashboard area and infotainment system electronics had been set on fire. This vehicle was stolen on September 7, 2021 in Silver Spring, Maryland.

Based on a review of surveillance video, the robbers used different vehicles to escape the area after abandoning and setting fire to the dark blue Infiniti.  One of the getaway vehicles was a gold Infiniti sedan.

The Government anticipates multiple witnesses testifying at trial as to Brock's role in this offense, corroborated by surveillance video, GPS monitoring, and DNA analysis.  At the time of the October robbery, Brock was subject to GPS monitoring.  Based on his location, and as reflected in surveillance video, Brock served as a lookout for the robbery.

Approximately one hour before the robbery, Brock arrived at the location of the robbery at the intersection of 14th Street and Good Hope Road Southeast.  Brock can be observed greeting another individual who—based on surveillance video—appears to have served as the getaway driver.



Between 8:35 a.m. and 8:45 a.m., Brock paced around the intersection of 14th Street Southeast and Good Hope Road Southeast, ultimately sitting at the WMATA bus stop on the

southwest corner of the intersection, as depicted below:



Brock's position at the bus stop provided a direct line of sight to where the robbery would occur, outside the SunTrust bank, at 1340 Good Hope Road SE.

At approximately 8:45 a.m., the gold Infiniti sedan which would later serve as the secondary getaway vehicle can be observed on video surveillance stopping at the intersection of 14th Street SE and Good Hope Road.  Brock's GPS location data places him at this spot.  After the vehicle stopped at the intersection, Brock walked westbound until he left the camera's view at 8:48 AM.

The robbery occurred at 9:24 a.m. at 1340 Good Hope Road SE.  Aware that he was on GPS monitoring, Brock remained away from the immediate area of the robbery during the robbery. Immediately afterwards, however, at approximately 9:27 a.m., Brock can be observed on surveillance returning to the intersection of 14th Street and Good Hope Road SE toward 14th Street SE. At approximately 9:29 a.m., while in view of an MPD surveillance camera, Brock appeared to receive a phone call. At the same time, another individual (Suspect 2) was observed on a RING surveillance camera walking hurriedly away from the location where the dark blue Infiniti SUV –

the vehicle used in the robbery – was abandoned and set on fire.  Suspect 2 appears to be speaking into a phone and can be heard saying "Hurry up, bro!" A review of Brock's cellphone records reflect that at the time this phone call was captured on, Brock placed a call from one of his phones to a contact in his phone called "My Other Phone."[5]  Minutes later, Suspect 2 got into the gold Infiniti secondary getaway vehicle with an individual believed to be Brock based on Brock's GPS location data and appearance in surveillance video.

A comparison of Suspect 2's appearance based on video of the robbery and video of the getaway reflects that Suspect 2 appears to have held the Brink's driver at gunpoint.



That is, as reflected above, he appears to be wearing the same clothing, shoes, hat, and has the same height and build.

Defendant Brock's GPS data, when reviewed alongside surveillance video, reflects that he fled the scene in the gold Infiniti sedan after climbing into the front passenger seat of the vehicle when it stopped at the intersection of 14th Street and Good Hope Road SE.  In other words, his GPS location data is consistent with the escape route used by the vehicle as reflected in surveillance video.

---

[5] Call records reflect that Brock had two calls with "My Other Phone" prior to the robbery at 6:22 and 8:46 AM.  Additionally, Brock exchanged four calls with "My Other Phone" immediately after the robbery, between 9:26 and 9:31 AM.

Law enforcement recovered and collected evidence from the dark blue partially burned Infiniti that was used to commit the robbery.  Specifically, law enforcement swabbed the interior of the vehicle and a head covering recovered in the car for DNA.  DNA analysis of a swab of the front area of the blue Infiniti reflects a profile 9.5 quintillion times more likely if Brock and an unknown, unrelated person are contributors than if two unknown, unrelated people are contributors.  Additionally, DNA analysis of a swab of a head covering found in the vehicle reflects a profile that is 49 quintillion times more likely if Brock is a contributor than if an unknown, unrelated person is a contributor.

Brock's phone was seized from him following his arrest.  That phone contained an image of the MPD BOLO from the October robbery.

### Brock's GPS Tampering Trial

After orchestrating the robbery of a Brinks truck in the morning, during the afternoon of October 6, 2021, Mr. Brock attended his trial in D.C. Superior Court for his October 2020 GPS violations.  That trial solely focused on Brock's October 2020 GPS violations on Device No. 12-790807, which was removed from his ankle in February 2021.  It had nothing to do with any GPS violations while Brock was wearing Device No. Device No. 12-750717 after March 2021.  Following trial, the Court found that the Government had not presented sufficient evidence that Brock was required to wear Device No. 12-790807 either as a condition of release imposed by the Court or as a sanction imposed by CSOSA.  Notably, the Court did not reference the fact that the third page of all three of Brock's J&Cs specified that GPS monitoring was to be a special condition of Brock's release.  The Court did not find that any subsequent installation of GPS devices on Brock was unlawful, including the device that was on Brock's ankle during the trial.

### The Government's Review of Brock's GPS Data

In April 2022, an eyewitness identified Brock to law enforcement as an individual who was involved in the October 6, 2021 robbery.  Law enforcement checked CSOSA data and confirmed that Brock was in the immediate area of the robbery.  On April 12, 2022, the FBI served legal process on CSOSA to obtain GPS data for Brock.  On May 24, 2022, CSOSA provided the requested information to the FBI.

## ARGUMENT

## I.   BROCK WAS LAWFULLY PLACED ON GPS MONITORING AS A SANCTION FOR NON-COMPLIANCE WITH PROBATION.

Brock claims that the Government is relying on GPS data from the GPS device that was installed on Brock on July 24, 2020.  Brock is wrong.  While Brock was initially placed on GPS as a condition of his release following his release into the community on July 24, 2020, that device was removed from Brock on February 8, 2021.  None of the data upon which the Government intends to rely at trial was collected from that device.  But on March 8, 2021, a GPS device was reinstalled on Brock as a sanction for violating the conditions of his release.  Specifically, it was placed on Brock for his arrest in an apartment filled with drugs and guns.  It is the data from this device that the Government intends on introducing at trial.

As Defendant Brock concedes, CSOSA has the authority to impose GPS monitoring as a sanction for failing to comply with conditions of release. Def.'s Mot. at 3. ("CSOSA has discretion to impose GPS monitoring on a supervisee as a sanction for failure to comply with conditions of release.").  CSOSA is the federal agency charged by law with supervising "offenders on probation, parole, and supervised release pursuant to the District of Columbia Official Code."  D.C. Code Ann. § 24-133(c)(1).  To that end, CSOSA was empowered to, among other things, "[d]evelop and operate intermediate sanctions and incentives programs for sentenced offenders." D.C. Code Ann. § 24-133(b)(2)(F).  CSOSA developed such sanctions and codified its sanctions program in Title

28 of the Code of Federal Regulations.  The regulations provide that "[i]f your CSO has reason to believe that you are failing to abide by the general or specific conditions of release or you are engaging in criminal activity, . . . [y]our CSO may then impose administrative sanctions . . . and/or request a hearing by the releasing authority.  28 C.F.R. § 810.3(a).  Administrative sanctions may include increased drug testing, referral for substance abuse treatment, travel restrictions, and electronic GPS monitoring.  28 C.F.R. § 810.3(b).  These sanctions can be applied without court approval.  Indeed, CSOSA's imposition of GPS monitoring as a sanction for non-compliance without court approval has been upheld twice by the D.C. Court of Appeals.  *See United States v. Jackson*, 214 A.3d 464, 467 (D.C. 2019) (holding that CSOSA's imposition of GPS monitoring without judicial authorization was lawful); *Atchison v. United States*, 257 A.3d 524, 530 (D.C. 2021) (same).

The relevant device was placed on Brock as a sanction for being re-arrested.  By law, as Brock concedes, CSOSA's installation of this device (Device No. 12-750717)—the only device relevant to this trial—was lawful.  Therefore, there is no basis to suppress data from that device.

## II.    CSOSA'S MONITORING OF BROCK WAS A REASONABLE SPECIAL NEEDS SEARCH.[6]

"Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995).  Our courts, however, have recognized some exceptions to this general rule.  One such exception, is where "special needs, beyond the

---

[6] It is not clear whether Brock is challenging the admissibility of data from a device that was lawfully installed on him.  In other words, Brock's motion appears to rest solely on the incorrect assertion that this device was unlawfully installed and does not more broadly challenge CSOSA's monitoring of Brock as an unlawful search.  In an abundance of caution the Government addresses the lawfulness of that search.

normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (internal quotations omitted).

In *Griffin v. Wisconsin*, the Supreme Court considered whether the operation of a probation system presented a special need justifying the warrantless search of probationers.  483 U.S. at 871.  There, by law, Wisconsin probationers' homes were subject to warrantless searches by their probation officers so long as the probation officer had reasonable grounds to believe that contraband was present, and a supervisor approved.  *Id.* at 870-71.  A probation officer received a tip that a probationer might have guns in his apartment.  *Id.* at 871.  Probation officers searched the probationer's home and found a gun, for which the probationer was ultimately charged and convicted.  *Id.* at 871-872.

The Supreme Court found that this warrantless search was a reasonable special needs search.  As the Court explained, "[a] State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements."  *Id.* at 873–74.  As an initial matter, "probationers . . . do not enjoy 'the absolute liberty to which every citizen is entitled, but only conditional liberty properly dependent on observance of special probation restrictions.'"  *Id.* at 874 (*quoting Morrissey v. Brewer,* 408 U.S. 471, 480 (1972)).  Restrictions imposed on probationers "are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large."  *Id.* at 875.  Further, "[t]hese same goals require and justify the exercise of supervision to assure that the restrictions are in fact observed."  *Id.*  As a result, "the special needs of Wisconsin's probation system make the warrant requirement impracticable and justify replacement of the standard of probable cause."  *Id.* at 876.  For these reasons, the Court

found that warrantless searches of probationers were reasonable special needs searches justified, in that case, by the fact that a probation officer had reasonable grounds to believe that contraband was present.

Based on this precedent, courts have regularly upheld the constitutionality of GPS monitoring of probationers, parolees, and the like. *See, e.g. Belleau v. Wall*, 811 F.3d 929, 935 (7th Cir. 2016) (upholding constitutionality of statute requiring persons released from civil commitment for sex offenses to wear a GPS monitoring device 24 hours a day for the rest of their lives); *United States v. Mathews*, 928 F.3d 968, 977 (10th Cir. 2019) (affirming denial of motion to suppress GPS evidence from a parolee as consistent with the Fourth Amendment); *United States v. Lambus*, 897 F.3d 368 (2d Cir. 2018) (holding that parolees subject to electronic monitoring as conditions of parole have no reasonable or legitimate expectation of privacy in their locations); *Mackey v. Hanson*, No. 19-CV-0162-PAB, 2019 WL 5894306 (D. Colo. Nov. 12, 2019) (holding that a man on pretrial release had no legitimate expectation of privacy in the GPS data collected by the ankle monitor that he agreed to wear as a condition of pretrial release.

In fact, the D.C. Court of Appeals has explicitly found that law enforcement's use of CSOSA's GPS monitoring data is lawful where that data resulted from CSOSA's imposition of a sanction. In *United States v. Jackson*, a probationer was placed on GPS monitoring by CSOSA because of a re-arrest, and failures to find employment and participate in other CSOSA programming. 214 A.3d at 468. The probationer reported for installation and signed similar forms to those signed by Brock. *Id.* at 469. The form he signed—like the one signed by Brock— acknowledged his understanding that his movement would be monitored. *Id.* Three weeks later, after an armed robbery, MPD detectives accessed CSOSA's GPS data to determine whether any individuals under supervision were in the area of the robbery. *Id.* at 469-470. They were able to

use this data to tie the defendant to the robbery. *Id.* at 470-471.

Relying heavily on *Griffin*, the Court of Appeals found that CSOSA's collection and law enforcement's use of this data was constitutional. *First*, the Court recognized that CSOSA's collection of GPS data is a special need, because it is an "effective tool [that] allows CSOSA to provide heightened supervision of high-risk offenders while allowing such offenders to productively rehabilitate in the community." *Jackson*, 214 A.3d at 476. *Second*, the Court found that placing the defendant on GPS monitoring was reasonable under the circumstances. *Id.* at 477-480. As an initial matter, a probationer has significantly diminished expectations of privacy, because "an offender under precautionary and rehabilitative supervision on release in lieu of incarceration must expect considerable supervisory intrusion on his privacy." *Id.* at 478. And while GPS monitoring is an intrusion, it "just identifies locations; it doesn't reveal what the wearer of the device is doing at any of the locations." *Id.* at 478 (*quoting Belleau*, 811 F.3d at 936). Moreover, CSOSA expressly discloses to a probationer the terms of their GPS monitoring when it requires them to sign the referral form and a contract. *Id.* at 478. "Knowledge of the monitoring enables the probationer to exercise some control over how much of his personal life is potentially exposed." *Id.* at 479. In light of this significantly diminished expectation of privacy, the infringement of GPS monitoring is minor when compared to CSOSA's legitimate interest in monitoring violent offenders. *Id.* at 479.

*Jackson* is indistinguishable from this case. CSOSA's collection of GPS monitoring data is no less a special need here than it was in *Jackson*. It allowed CSOSA to monitor a repeat violent offender, relying on its familiarity with that offender and without having to wait for judicial intervention. As evidenced by the fact that CSOSA removed Brock's GPS device at one point, it also allowed CSOSA to appropriately toggle its level of supervision based on Brock's compliance

17

(or more commonly lack thereof). Brock's expectations of privacy are just as diminished as in *Jackson*. In fact, Brock's are even more diminished because—unlike in *Jackson*—he had been previously subjected to GPS monitoring and was required to review and sign the same forms multiple times. Moreover, the forms that Brock signed include more explicit warnings as to the uses of any collected GPS data than those in *Jackson*. The forms signed by the probationer in *Jackson* did not include the following express notice:

> All GPS data including tracking and suspected violation data are accessible to various local (i.e. Metropolitan Police Department) and notational (i.e. U.S. Capitol Police) law enforcement agencies. In addition to CSOSA, your device may be monitored by these law enforcement agencies.

Exhibits D, E, F, at ¶ 14.

Brock signed contracts with this disclosure three separate times. Moreover, Brock was cautioned and sanctioned repeatedly by his CSO for his numerous GPS curfew violations. He was well aware that his movement was being monitored and knowingly chose to advertise his location on October 6, 2021 to law enforcement. Given Brock's diminished expectation of privacy and explicit awareness that his location was being monitored and could be provided to law enforcement, CSOSA's interest in monitoring his location to supervise his rehabilitation while assuring the safety of the community constitutes a reasonable special need search.[7]

## III. TO THE EXTENT THERE IS ANY QUESTION CONCERNING THE PROPRIETY OF CSOSA'S CONDUCT, THE ATTENUATION DOCTRINE APPLIES.

To the extent the Court were to find that CSOSA acted improperly in installing any GPS device on Brock, the FBI's review of any resulting GPS data is attenuated and therefore should

---

[7] Brock's motion does not appear to challenge law enforcement's subsequent use of CSOSA's data as unlawful search. To the extent the defendant raises such arguments, the Government reserves the right to supplement this opposition.

not be suppressed.

Where a court finds a Fourth Amendment violation, the exclusionary rule generally applies to primary evidence obtained as a result of the illegal search or seizure, as well as derivative evidence, known as "fruit of the poisonous tree."  See *Utah v. Strieff*, 579 U.S. 232, 237–38 (2016). "But the significant costs of this rule have led [our courts] to deem it 'applicable only . . . where its deterrence benefits outweigh its substantial social costs.'"  *Id.* (*quoting Hudson v. Michigan,* 547 U.S. 586, 591 (2006)).  Put simply, "[s]uppression of evidence, . . . has always been our last resort, not our first impulse."  *Hudson*, 547 U.S. at 591.

Consistent with these concerns, our courts have determined that under certain circumstances evidence derived from illegal searches or seizures should not be excluded.  One such circumstance is where derivative evidence is "so attenuated from the illegal search or seizure that the taint of the unlawful government conduct was dissipated." *United States v. Holmes*, 505 F.3d 1288, 1293 (D.C. Cir. 2007) (citations omitted).  Courts consider three factors when determining whether evidence is sufficiently attenuated:  *first*, the amount of time between the illegality and the discovery of the evidence; *second*, the presence of intervening circumstances; and *third*, the purpose and flagrancy of the illegal conduct.  *See United States v. Hassanshahi*, 75 F. Supp. 3d 101, 109–10 (D.D.C. 2014).  The Supreme Court has described this third factor as "particularly" significant.  *Strieff*, 579 U.S. at 239.  All three factors strongly favor a finding of attenuation and denying defendant's request to suppress Brock's GPS data.

*First*, the amount of time between the alleged illegality—CSOSA's July 2020 installation of a GPS device—and law enforcement's April 9, 2022 review of Brock's GPS data was lengthy. This factor favors attenuation where "substantial time" elapses between an unlawful act and when the evidence is obtained. *Kaupp v. Texas,* 538 U.S. 626, 633 (2003) (*per curiam*).  The almost two-

year gap here is certainly substantial.  While our courts have not recognized a bright-line test for temporal proximity in this context, *see Hassanshahi*, 75 F. Supp. 3d at 110, courts have found that far shorter gaps favored findings of attenuation.  *See, e.g.*, *id.* (gap of several months); *United States v. Gross,* 662 F.3d 393, 402 (6th Cir. 2011) (two-month gap); *United States v. Roberts,* No. 11–CR–0018, 2012 WL 1033515, at *7 (E.D.Pa. Mar. 28, 2012) (more than two months); *United States v. Lawrence,* No. CRIM.05–333, 2006 WL 752920, at *6 (D. Minn. Mar. 23, 2006) (four months).  Indeed, the cases where courts have rejected attenuation arguments generally involved significantly shorter gaps.  *See, e.g.*, *United States v. Brodie*, 742 F.3d 1058, 1063 (D.C. Cir. 2014) ("mere seconds"); *United States v. Miller,* 146 F.3d 274, 280 (5th Cir. 1998) (ninety-second gap); *United States v. Green,* 111 F.3d 515, 521 (7th Cir. 1997) (five-minute gap); *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987) (gap of a few minutes).  In light of the significant gap between when the allegedly unlawful action occurred and when law enforcement obtained the data, this factor strongly favor attenuation.

The second factor—the presence of intervening circumstances—likewise favors attenuation.  "[T]he intervening circumstance that most strongly dissipates the evidentiary taint is a 'voluntary act by the defendant.'"  *Hassanshahi*, 75 F. Supp. 3d at 110 (*quoting Green*, 11 F.3d at 522.  Here, Brock's continuing non-compliance with his conditions of release are what caused him to be placed on GPS monitoring and what generated his location data on October 6, 2021.  Law enforcement had absolutely nothing to do with Brock's decisions to use drugs, fail to report, fail to attend programming, and commit new crimes.  But for his actions, after the removal of his device in February 2020, he would not have been subjected to GPS monitoring.  It was Brock— and not law enforcement—that created the basis for his GPS monitoring that led to the existence of GPS data implicating him in a crime.  Indeed, it was Brock who voluntarily placed himself at

the scene of the robbery while aware that he was on GPS monitoring.   But for Brock's decisions, this GPS data would not exist.  And CSOSA's decision to place Brock on GPS monitoring for his continued violation was both lawful and reasonable.  Therefore, Brock's voluntary actions constitute intervening circumstances that favor a finding of attenuation.

Finally, the third factor, the purpose and flagrancy of the official misconduct, strongly favors a finding of attenuation.  This factor "reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Strieff*, 579 U.S. at 241.  It is not clear that any misconduct occurred here whatsoever.  At best, a CSO *may* have misread Brock's J&Cs to require the imposition of GPS monitoring.  But this was not clearly a mistake, let alone flagrant misconduct.  Brock's three J&Cs all contained identical GPS monitoring conditions following the header "**Other Special Conditions**."  In that context, it seems reasonable for a CSO to assume that GPS monitoring was a condition of Brock's release. That assumption seems all the more reasonable when CSOSA continued to report Brock's non-compliance with GPS monitoring to his sentencing judge and neither the Court, Brock, nor his defense counsel ever objected to that condition.  There is nothing to indicate that the CSO acted with anything other than "objectively reasonable good-faith belief that their conduct is lawful," and at most "their conduct involves only simple, isolated negligence."  *Hassanshahi*, 75 F. Supp. 3d at 113.  Therefore, this factor strongly weighs in favor of attenuation.[8]

---

[8] To the extent the Court focuses on law enforcement's conduct in this case, there is no basis whatsoever for finding purposeful or flagrant misconduct.  Neither MPD nor FBI were involved in the decision to place Brock on GPS monitoring.  In the course of investigating a serious violent crime, MPD made use of information lawfully accessible to them:  CSOSA's GPS data. After MPD identified Brock as a potential suspect, the FBI took the additional step of serving CSOSA with legal process to obtain Brock's GPS data.  Law enforcement's conduct here was completely lawful.

## **CONCLUSION**

For all the foregoing reasons, the Court should deny Brock's motion to suppress.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:          */s/ Cameron A. Tepfer*
Cameron A. Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
202-258-3515
Cameron.Tepfer@usdoj.gov